Receipt

ORIGINAL

FILED
JUL 8 2004
U.S. COURT OF FEDERAL CLAIMS

ECF

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

AMERICAN TECH CORP.,
Plaintiff,

v.

THE UNITED STATES
Defendant.

No. 04-1133C

## COMPLAINT

Plaintiff American Tech Corp., a Washington corporation, by and through its attorneys of record, Ann Marie Bender and James A. Smith, Jr. of Smith & Hennessey, PLLC, brings this Complaint against the United States of America and states as follows:

### Parties and Jurisdiction

1. Plaintiff American Tech Corp. ("ATC") is a corporation duly licensed by the State of Washington.

2. Defendant is the United States of America. The Immigration and Naturalization Service ("INS") was bureau of the Department of Justice, an agency of the United States, during all relevant periods. In 2003, the functions of INS were absorbed by various bureaus within the Department of Homeland Security.

3. This Court has subject matter jurisdiction pursuant to the Tucker Act, 28 U.S.C. §1491(a)(1).

4. Plaintiff seeks judgment in the amount of $269,000.80, plus accrued interest.



ORIGINAL

5. Plaintiff further seeks an award of its attorney's fees and costs incurred in bringing this action, pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412.

6. Plaintiff further seeks such other relief as is deemed just and equitable.

**Factual Allegations**

7. ATC is a Tacoma, Washington corporation specializing in audio and video security systems. ATC has been in the field for nearly twenty years, and is licensed and insured as an electrical contractor by the State of Washington. ATC is a member of the Better Business Bureau and the Master Builders Association.

8. INS was a regular customer of ATC over the years. For example, since 1989, ATC has worked on the INS detention facility at 815 Airport Way South, near the Seattle-Tacoma International Airport ("SEATAC"), installing camera systems, entry access systems, and television systems. The bulk of ATC's work at this building was routed through Correctional Services Corporation, a detention facility contractor. INS always was satisfied with ATC's work.

9. In August 2001, Steve Chang of the INS's Seattle office contacted Lee Wilson, President of ATC. Chang requested estimates for security systems at Pier 66 in Seattle—the Cruise Ship Terminal—and at SEATAC. Wilson understood that someone from INS had referred Chang to ATC. INS needed equipment that would record interactions between INS officers and travelers seeking admission to the United States to aid in the investigation of complaints against INS and for training purposes.

10. Chang stated that he had contacted several other firms in the Puget Sound area, but none of them could complete the full scope of the project. ATC was able to design a cost-

effective and workable system when others were unable to do so, and sent INS an initial estimate on August 27, 2001. INS agreed to hire ATC to complete the installations, and ATC agreed to perform the work.

11. INS apparently was satisfied with ATC's proposals regarding SEATAC and the Cruise Ship Terminal. Following the events of September 11, 2001, INS also asked ATC to install a system for at the Peace Arch Port of Entry in Blaine, Washington. ATC agreed to do so.

12. In their initial contacts, Wilson and Chang discussed the method of payment for services. Chang stated that INS would pay ATC by government credit card upon the completion of each installation.

13. In early September 2001, only a few days before the terrorist attacks of September 11, Chang contacted ATC and stated that ATC should begin work on the Cruise Ship Terminal installation. On September 13, 2001, ATC personnel met with INS inspector Remy Valenzuela at the Cruise Ship Terminal to discuss the project details. Valenzuela also introduced the ATC personnel to the lead Maintenance Supervisor and Electrician for the Port of Seattle, who provided specifications for the project.

14. ATC started the Cruise Ship Terminal installation on September 13, 2001, and finished it on October 11, 2001. On October 17, 2001, INS authorized four payments to ATC for the Cruise Ship Terminal project on a government credit card. The four payments were for $12,913.90, $21,132.50, $5,850.00, $1,767.50, and, for a total of $41,663.90. Copies of ATC's invoices for the Cruise Ship Terminal project, numbered 12483, 12565, 12559, and 12558, and the corresponding credit card slips, are attached hereto as Exhibit A.

15. On September 19, 2001, at Chang's request, Wilson and Mark Bazin of ATC traveled to the Peace Arch Port of Entry in Blaine, Washington. Wilson and Bazin met with Pat Boettcher, INS Director of the Peach Arch Port of Entry, and INS Director Bruce Bruner of the Pacific Highway Port of Entry, also known as the Bus and Truck Port of Entry in Blaine, Washington.

16. During their visit to the Pacific Highway Port of Entry, Bruner told Wilson and Bazin that a vendor recently demonstrated a Digital Video Recording ("DVR") system to him. The vendor also provided him with an estimate of $125,000.00 for a DVR system to work with the ten cameras already installed at the Pacific Highway Port of Entry. Such a DVR system would be significantly more expensive than the one originally proposed by ATC. However, it would hold many more recordings, without the need for changing and storing VCR tapes.

17. Boettcher and Bruner provided ATC with the details of the system they desired at the Peach Arch Port of Entry. They specifically requested a system that could hold up to six months of recordings. The equipment contemplated in ATC's initial estimate did not have the technical capability to store up to six months of recordings.

18. Based upon directors Boettcher's and Bruner's request, Wilson immediately sought to obtain an estimate for such a system. He attended the American Association of Industrial Security Convention in San Antonio, Texas. He found a DVR system that could fulfill the INS's requirements. As expected, the DVR system was much more expensive than ATC's original estimate.

19. In early October 2001, Wilson and Dale Wolfe of ATC met with Chang and presented him with a system design for the Peace Arch Port of Entry and SEATAC which

included the DVR system. Chang approved the system, despite the higher cost. He told ATC to begin work on the Peace Arch project immediately, and to start work on the SEATAC project upon completion of the Peach Arch installation. ATC agreed to do so. Due to the cost of the DVR units, Chang and ATC also agreed that only eight DVRs would be installed at the Peace Arch, rather than the 13 which would be optimal. Director Boettcher was present at the time Chang requested that ATC complete these projects.

20. On November 1, 2001, ATC began work on the Peace Arch project. ATC completed the project on December 1, 2001. During the installation, ATC worked closely with INS and the General Services Administration ("GSA"), making changes as requested by the government. For example, the GSA requested that ATC install Plenum-rated wire, which was not contemplated in the original proposal. ATC fulfilled the GSA's request.

21. Upon completion of the Peace Arch project, INS again paid ATC with a government credit card. The initial total for all work at the Peace Arch was $188,878.40. INS paid the total in five credit card charges as follows: $19,526.40 and $23,369.00 on December 3, 2001; and $22,627.00, $21,678.00, and $21,678.00 on December 17, 2001. Copies of ATC's invoices, numbered 12588, 12589, 12621, 12640, 12641, and the corresponding credit card slips are attached hereto as Exhibit B.

22. INS also requested additional hard drives for the Peace Arch installations. As stated above, INS chose to install only eight DVR units, rather than the optimal 13 units. For this reason, the hard drives attached to the recorders filled up more quickly. To compensate, INS requested that ATC install additional hard drives. Chang authorized four charges on his government credit card of $2495.00 each, for a total of $9980.00, to pay for the additional hard

drives. Copies of ATC's invoices, numbered 12799, 12803, 12856, and 12857, and the corresponding credit card slips are attached hereto as Exhibit C.

23. Over the course of the Cruise Ship Terminal and Peace Arch installations, ATC took instruction primarily from Chang. Chang often mentioned his supervisor, Ronald Hayes, and indicated that Hayes had approved INS's contract with ATC for work on these projects. ATC also had numerous contacts with other INS, Customs, and Port personnel regarding progress and specifications.

24. INS never provided ATC with a purchase order number for the Cruise Ship Terminal and Peace Arch Projects. INS paid all amounts due and owing for those two projects to ATC by credit card.

25. In late January 2002, Chang contacted ATC by telephone to inquire about ATC's progress on the SEATAC installation. Immediately thereafter, at Chang's request, ATC started work on the SEATAC project.

26. The SEATAC installation was significantly more complex than the Peach Arch and Cruise Ship Terminal projects. ATC had to work closely with the Port of Seattle and INS to fulfill all specifications of both agencies. The project required various levels of approval by both agencies.

27. In addition, ATC personnel and the electrical contractors underwent FBI and US Customs background checks to obtain security clearance to work in sensitive areas of the airport. Every ATC staff member who worked on the project obtained the necessary clearances. They had full access to all areas of the INS facility at SEATAC, including offices, attic and ceiling spaces, entries, exits, and elevators.

28. On January 24, 2002, Wilson, Bazin, and Marty Sechrist of ATC met with INS's SEATAC Port Director, Al Deitering. The group did a walk-through of the project the project. Deitering also presented INS's needs for the SEATAC Port of Entry. Deitering and the ATC representatives further discussed the need for repair of cameras and intercom units in the INS detention cells, which were not working. Deitering expressed his concern, stating that INS was legally required to have this equipment in operating condition.

29. Completion of the SEATAC project was contingent upon approval by The Port of Seattle. The Port of Seattle assigned Roi Nevaril, a 30-year veteran of SEATAC, as project manager for the installation. Nevaril assisted in obtaining approval from the necessary Port of Seattle committees, including the Sea-Tac Telecommunications Architecture Review Team ("START") and the Proactive Electrical Systems Team ("PEST") Committees.

30. The Port of Seattle approval process took several months. During this period, ATC kept INS informed of progress through facsimile and mail. On March 4, 2002, for example, ATC informed Chang by facsimile that Deitering and Chong Kim had requested ten additional cameras, and access to the camera system from the supervisors' offices. ATC included a revised estimate for the cost of the cameras, microphones and wiring. See Exh. D. On July 3, 2002, ATC provided INS with a progress report regarding the Port of Seattle approval process. See Exh. E.

31. Wilson and Nevaril both spoke with Director Deitering regarding the approval process on many occasions. SHJ Electric, the electrical subcontractor hired to work on the project, also was closely involved in the approval process, and met with Deitering to discuss

electrical requirements during this period. David Willis, Port of Seattle Senior Construction Inspector, met with Deitering, as well.

32. By mid-July 2002, the Port of Seattle was close to granting full approval for the project, pending a final meeting of the START Committee. Director Deitering, Chang, Hayes and ATC personnel conducted a walk-through of the project around this time. At this meeting, INS added several specifications to the installation, and requested that ATC repair the detention cell deficiencies.

33. In late July 2002, the START Committee granted final approval of the project. ATC immediately advised INS and informed INS that the electricians would install the necessary power circuit in the near future. See Exh. F.

34. On August 2, 2002, prior to starting the installation, ATC sent a letter to INS which discussed the details of the SEATAC project. The letter included several invoices, which broke down the work to be done to facilitate INS's understanding of the system and costs. A copy of the letter and attachments it attached hereto as Exhibit G. Invoice Number 12712, for $87,293.80, represents charges for cameras, microphones and wiring. Invoice Number 12938 for $105,607.00, and Invoice Number 12939 for $76,100.00, reflect charges for the DVR units. Invoice 12937, for $15,470.00 represents an upgrade for more electrical service to be added to the equipment and for conduit to be installed through housewiring above the ceiling grid. Invoice number 12940 for $6800.00 is for a Pan/Tilt/Zoom camera that Director Deitering requested ATC add to the installation.

35. Thus, in total, the SEATAC installation would cost $291,270.80. INS agreed to pay this sum to ATC, and, in exchange, ATC agreed to perform the installation and provide the equipment.

36. As agreed, ATC began work on the SEATAC project in early August 2002. ATC personnel and the electricians continuously accessed sensitive areas of the airport at all hours. INS, Customs and Port of Seattle officials all knew that ATC was present and working on this project.

37. In early August, around the same time that ATC began work on the installation, Chang contacted Wilson and stated that Chang would obtain a purchase order number for the SEATAC project. Wilson asked Chang whether ATC should delay work on the project until Chang had obtained the purchase order number. Chang told Wilson that no delay was necessary, that he would obtain the purchase order number, and that ATC should continue work on the project.

38. In mid-August 2002, ATC contacted Chang and told him that the SEATAC installation was well underway.

39. On August 18, 2002, ATC provided INS with manufacturers specification sheets for the SEATAC security system. See Exh. H.

40. On August 19, 2002 INS authorized a charge of $22,270.00 on the government credit card for invoices 12937 and 12940. See Exh. I.

41. Also on August 19, 2002, ATC met with Ed Bleck and Richard Spring of the INS. ATC understood that Bleck was a contract security specialist and Spring was an INS officer. Bleck seemed particularly interested and enthusiastic about ATC's work, and asked ATC to

provide him with information regarding the Seattle "Command Center," from which INS could monitor all of the ATC installations in Western Washington. Following this meeting, ATC sent a letter to Bleck responding to certain inquiries about the system. See Exh. J.

42. Around September 3, 2002, Rosemarie Mendoza, Contract Specialist from the San Diego office of the INS, contacted ATC seeking information necessary for the issuance of a purchase order number. She seemed surprised that ATC had nearly completed work on the project. Mendoza told ATC that she would contact ATC again in the future.

43. Near the end of the day on September 5, 2002, Ed Martinez, who apparently had replaced Hayes in the Seattle INS office, contacted ATC. ATC personnel were preparing to put the finishing touches on the SEATAC project, and, in fact, were at the computer supplier to pick up the last ten DVR units. Martinez asked ATC to cease its work on the project until INS could sort out its paperwork with the San Diego office. Martinez stated that INS would pay ATC for its work on the project.

44. ATC immediately ceased work, and returned to SEATAC only to pick up tools.

45. On September 10, 2002, Al Barclay from the San Diego office of the INS contacted ATC and reiterated Martinez's message—that there was a problem between the Seattle and San Diego offices with the paperwork for the project, but that INS would pay ATC.

46. ATC had nearly completed the installation, and had purchased all of the DVR units for the SEATAC project, when Martinez placed the stop work order. Only installation of the last ten DVRs, final hook-up of the Pan/Tilt/Zoom dome, and some other minor installations and system adjustments remained to be done. ATC expected all system features to be fully functional by the end of work on September 7, 2002. Invoice Number 12712, for $87,293.80,

Invoice Number 12938 for $105,607.00, and Invoice Number 12939 for $76,100.00 all were outstanding when ATC ceased work. INS owed ATC $269,000.80. That amount is still owed today.

47. During the fall of 2002, it became clear that INS did not intend to pay ATC for the work it had done or the equipment it had installed. Carol Amano, Certified Associate Contracts Manager for the San Diego office of the INS, was assigned to investigate ATC's claim.

48. ATC cooperated fully with Amano's investigation, providing her with a detailed chronology and its file on the SEATAC project.

49. The INS refused to honor its contract with ATC. Therefore, on November 22, 2002, ATC submitted a written claim to Steve Chang, as the contracting officer, pursuant to the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §6055. See Exh. K.

50. On January 31, 2003, Amano responded to ATC's CDA claim, stating that: "This is not a claim arising under or relating to a contract. In fact, no contract ever existed for the performance of work. I cannot consider this a claim under the Contract Disputes Act of 1978 as [ATC] has no relief under an existing contract. ...[T]he circumstances surrounding the installation of surveillance equipment at Seattle airport is being reviewed by the Department of Justice Office of Internal Audit." See Exh. L.

51. In the meantime, the INS Department of Internal Audit began an investigation of INS's breach of its agreement with ATC. The agent assigned, Joe Fahey, traveled to Seattle in January 2003 to investigate ATC's claims. Fahey interviewed Wilson of ATC. Presumably, he also interviewed Chang and other key parties at INS.

52. ATC never received a copy of Fahey's report; however, ATC believes that the report exists and exonerates ATC of any wrongdoing regarding the SEATAC installation. Despite Fahey's findings, INS did not pay ATC for the work and the equipment.

53. On August 19, 2003, ATC made a Freedom of Information Act ("FOIA") request for Fahey's report and other pertinent information regarding this matter. See Exh. M. To date, ATC has not received information responsive to its FOIA request.

54. In 2003, INS was subsumed into the Department of Homeland Security, and its functions distributed among several bureaus, including U.S. Citizenship and Immigration Services ("USCIS"); Bureau of Customs and Border Protection ("BCBP"); Bureau of Immigration and Customs Enforcement ("ICE"); and Office of Immigration Statistics.

55. At the suggestion of ICE officials, on October 24, 2003, ATC submitted a Standard Form 95 claim for its losses on the SEATAC project, pursuant to the Federal Tort Claims Act, 28 U.S.C. §1346(b). See Exh. N.

56. On January 9, 2004, Carmen Z. Everett, Senior Administrative Law Attorney for ICE denied ATC's claim, stating: "This office has reviewed the circumstances surrounding this incident and has determined that you have failed to establish that any negligent or wrongful act or omission of a federal government employee caused this incident to occur. The claim alleges a breach of contract rather than a tort claim. Contract claims are not cognizable under the Federal Tort Claims Act." See Exh. O.

57. To date, the INS/ICE has not paid for the custom-designed, state-of-the art security system that ATC installed at SEATAC. On information and belief, the United States has benefited from ATC's work and equipment.

## Causes of Action

## COUNT I

## BREACH OF CONTRACT

58. Plaintiff repeats and realleges paragraphs 1 through 57 above.

59. INS agreed to purchase and ATC agreed to install a security surveillance system at SEATAC. The parties' agreement constituted a valid and binding contract between them.

60. The agreed upon price for the equipment and the installation of this system was $291,270.80.

61. ATC provided the equipment and installed the system pursuant to the terms of its contract with INS.

62. On information and belief, the United States has benefited from ATC's work.

63. INS paid only $22,270.00 of the total amount due on the contract.

64. INS/ICE's failure to pay the remaining amount due and owing to ATC constitutes a material breach of contract.

## COUNT II

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

65. Plaintiff repeats and realleges paragraphs 1 through 64 above.

66. INS/ICE had an implied duty of good faith and fair dealing in its relationship with ATC.

67. By the acts described above and others, INS/ICE breached its implied duty of good faith and fair dealing to ATC.

68. ATC has been damaged as a result of INS/ICE's breach, and continues to be damaged by the manner in which the United States has conducted its investigation of ATC's claim.

## COUNT III

## TAKING

69. Plaintiff repeats and realleges paragraphs 1 through 68 above.

70. By accepting goods and services from ATC, the United States has effected a taking of ATC's property for which ATC is entitled to just compensation under the Fifth Amendment to the United States Constitution.

71. The United States, through INS/ICE, has refused to pay ATC such just compensation.

## Prayer for Relief

72. WHEREFORE, plaintiff demands judgment be entered against the United States for:

(a) $269,000.80, the amount past due on the contract, plus interest;

(b) attorney's fees and costs, as allowed by law; and

(c) such other and further equitable and legal relief as the Court deems just and proper.

DATED this 7th day of July, 2004.

SMITH & HENNESSEY PLLC

James A. Smith, Jr., WSBA 5444
Ann Marie Bender, WSBA 32563
Smith & Hennessey, PLLC
316 Occidental Avenue South, Suite 500
Seattle, Washington 98104
Telephone: (206) 292-1770
Facsimile: (206) 292-1790

*Counsel for Plaintiff American Tech Corp*

S&H Server:6131_AmericanTech:Pleadings:Complaint.doc